Clayton RUNCK, Jr., Petitioner
and Appellant,

v.

STATE of North Dakota, Respondent
and Appellee.

Civ. No. 910259.

Supreme Court of North Dakota.

Feb. 23, 1993.

Brothers & Beauchene, Fargo, for petitioner and appellant; argued by Mark A. Beauchene. Appearance by Clayton Runck, Jr.

John Tainter Goff, State's Atty., Fargo, for respondent and appellee.

VANDE WALLE, Chief Justice.

Clayton Runck, Jr., appeals from district court orders denying his application for post-conviction relief and motions for reconsideration. The district court rejected, among other contentions, Runck's assertion that his August 1986 State court convictions for conspiracy to commit arson and for being an accomplice to arson should be set aside because the State violated the Interstate Agreement on Detainers Act, Chapter 29–34, N.D.C.C. We reverse and remand for further proceedings.

The parties have stipulated to many of the facts. On November 9, 1984, Runck was convicted of a federal offense in United States District Court for the District of North Dakota and was sentenced to a nine-year term of imprisonment. Rather than

being sent to a federal correctional institution, Runck was remanded to the custody of the United States Marshal Service and was held in the Cass County jail in Fargo to testify in a pending federal prosecution.

On March 8, 1985, while Runck was still housed in the Cass County jail under authority of the Marshal Service, the State district court issued a writ of habeas corpus ad prosequendum, which stated in part:

"TO THE U.S. MARSHALL (sic), FARGO, NORTH DAKOTA:

"YOU ARE HEREBY COMMANDED to surrender Clayton Runck to Sheriff Donald Rudnick, Cass County, North Dakota, or his duly authorized representative, pursuant to the Affidavit and Order attached hereto." [1]

The affidavit attached to the writ stated:

"James Twomey, being first duly sworn upon oath deposes and states:

"1. That the defendant will be charged with felony criminal offenses in the Cass County Court.

"2. That the defendant is now in the custody of the U.S. Marshall (sic), Fargo, North Dakota;

"WHEREFORE, your affiant prays that the Clerk of District Court be ordered to issue a Writ of Habeas Corpus Ad Prosequendum requesting and commanding the Cass County Sheriff and the U.S. Marshall (sic) to surrender the defendant, Clayton Runck, to the Sheriff of Cass County until such time as the initial proceedings have been completed before the Cass County Court as directed by that Court, and thereafter to return the defendant to the U.S. Marshall (sic)."

The order attached to the writ stated:

"The Court having considered the Affidavit of James Twoemy (sic). Assistant States Attorney for Cass County, North Dakota, and having examined the criminal complaint filed in Cass County Court,

"IT IS HEREBY ORDERED that the Clerk of this Court issue a Writ of Habeas Corpus Ad Prosequendum requesting and commanding the U.S. Marshall (sic) to surrender the said Clayton Runck to the Sheriff of Cass County immediately and until such time that the initial proceedings on the charges to be filed against him have been completed as directed by the Cass County Court and upon the completion of such proceedings to return the defendant to the U.S. Marshall (sic)."

There was an undated complaint in existence when the writ was issued, but the complaint was not yet filed with the county court and it was not served upon the Marshal Service along with the writ, affidavit, and order. The Marshal Service complied with the writ and the State received custody of Runck on March 8, 1985.

On March 12, 1985, a criminal complaint was filed in county court charging Runck, Clinton Kopp, and Terry Kopp with conspiracy to commit arson and being accomplices to arson, relating to an April 1983 fire at the Kopps's home. After Runck secured counsel, Runck and the Kopps had their preliminary hearing in county court on April 23, 1985, and the defendants were bound over on the charges.

The defendants were arraigned in district court on May 14, 1985, and each entered a not guilty plea. During the ensuing months, Runck and the State each filed demands for change of judge and one assigned judge recused himself. During June 1985, Runck filed numerous pretrial motions, including a demand for speedy trial. The request for speedy trial did not specifically mention the Interstate Agreement on Detainers Act. On July 17, 1985, this court designated a district court judge to preside over the case, and he set September 20, 1985, as the hearing date for the pretrial motions.

---

1. The writ of habeas corpus ad prosequendum further stated:

"TO SHERIFF DONALD RUDNICK, CASS COUNTY, NORTH DAKOTA:

"YOU ARE HEREBY COMMANDED to receive Clayton Runck from the U.S. Marshall (sic) and bring him before the Cass County Court for initial proceedings on felony matters to be brought before that Court and to return the defendant to the custody of the U.S. Marshall (sic) upon the completion of the initial proceedings as directed by the Cass County Court."

Runck's retained attorney was unable to further participate in the proceedings and Runck obtained the services of another attorney. The district court granted the defendants' motion for a change of venue. Runck and Clinton Kopp's trial was scheduled for January 4, 1986, in Mandan, and Terry Kopp's trial was scheduled for March 4, 1986, also in Mandan. On December 30, 1985, Runck signed an agreement in which he agreed to plead guilty to conspiracy to commit arson in return for dismissal of the other charge and for a specific recommendation for a sentence by the State. However, the plea agreement was conditioned on Runck testifying truthfully at any hearing or trial regarding his or anyone else's involvement in the April 1983 fire. It was also agreed that sentencing would be delayed until the trials of the other defendants were concluded and that the court could order a pre-sentence investigation. The court ordered a pre-sentence investigation.

In January 1986, Runck was returned to the custody of federal authorities, and he was transferred to a federal correctional institution in Oxford, Wisconsin, pending his testimony at Terry Kopp's trial. Clinton Kopp pleaded guilty. On March 7, 1986, Runck was returned from the federal correctional institution to North Dakota to testify at the trial pursuant to a writ of habeas corpus ad testificandum. *See State v. Kopp*, 419 N.W.2d 169 (N.D.1988). However, Runck refused to testify, asserting his right against self-incrimination, and the court honored his claim of privilege. Runck was then returned to the federal correctional institution.

On April 25, 1986, the State executed and sent to the federal correctional institution in Oxford a "Prosecutor's Acceptance of Temporary Custody Offered in Connection with Defendant's Request for Disposition," which the federal officials treated as a request made pursuant to the Interstate Agreement on Detainers Act. On May 9, 1986, the federal correctional institution informed the State that Runck's "detainer papers" had been received, that Runck had invoked the 30–day time constraint under Article IV(1), and that Runck would there-

fore not be available to the State before June 6, 1986. On June 5, 1986, the State received another of Runck's general motions for dismissal based upon denial of a speedy trial. After Runck was returned to North Dakota, his motion for dismissal was denied. On July 9, 1986, an order was entered formally rejecting Runck's contingent plea agreement. Not guilty pleas were entered to the charges and trial was set for August 12, 1986, in Morton County.

By then, Runck was represented by a different attorney. Although in March and June 1986, Runck and the new attorney discussed possible issues regarding the Interstate Agreement on Detainers Act, no motion was made raising any of those issues to the court. Runck was convicted of conspiracy to commit arson and of being an accomplice to arson on August 15, 1986, and he was sentenced on each count to concurrent terms of eight years at the State Penitentiary to begin after completion of his federal sentence. Runck was returned to the federal correctional institution at Oxford on October 27, 1986. We affirmed his convictions in *State v. Runck*, 418 N.W.2d 262 (N.D.1987).

Runck thereafter sought post-conviction relief, asserting several alleged violations of the Interstate Agreement on Detainers Act, ineffective assistance of counsel, and other alleged violations of legal and constitutional rights. Following several hearings on the matter, the trial court denied Runck's application. The court determined that no violation of the Interstate Agreement on Detainers Act occurred in this case, and that Runck was not denied effective assistance of counsel at trial or on appeal from his criminal convictions. The court also rejected Runck's other asserted grounds for relief and denied his motions for reconsideration. This appeal followed.

I

In 1971, North Dakota enacted the Interstate Agreement on Detainers Act [IAD], Chapter 29–34, N.D.C.C. The IAD is a uniform law which has been enacted by 48 states. The federal government, on its

own behalf and on behalf of the District of Columbia, adopted the IAD in 1970 [*see* Pub.L. 91–538, §§ 1–8, 84 Stat. 1397–1403, 18 U.S.C. Appendix (Dec. 9, 1970) ], and, for purposes of the IAD, the term "state" includes the United States. *See* Article II(1). The IAD "prescribes procedures by which a prisoner may demand the prompt disposition of charges pending against him in a state other than the one in which he is imprisoned, as well as procedures by which a state may obtain for trial a prisoner who is incarcerated in another state." Annot., *Validity, Construction, and Application of Interstate Agreement on Detainers,* 98 A.L.R.3d 160, 166 (1980) [footnote omitted].

■ The IAD is intended to minimize uncertainties which obstruct programs of prisoner treatment and rehabilitation caused by the existence of outstanding charges against a prisoner and detainers based on untried indictments, informations, or complaints in other jurisdictions. *See* Article I. In *Cuyler v. Adams,* 449 U.S. 433, 449, 101 S.Ct. 703, 712, 66 L.Ed.2d 641 (1981), the Supreme Court recognized that:

" '[A] prisoner who has had a detainer lodged against him is seriously disadvantaged by such action. He is in custody and therefore in no position to seek witnesses or to preserve his defense. He must often be kept in close custody and is ineligible for desirable work assignments. What is more, when detainers are filed against a prisoner he sometimes loses interest in institutional opportunities because he must serve his sentence without knowing what additional sentences may lie before him, or when, if ever, he will be in a position to employ the education and skills he may be developing.' H.R.Rep. No. 91–1018, p. 3 (1970); S.Rep. No. 91–1356, p. 3 (1970), U.S.Code Cong. & Admin.News 1970, p. 4866."

Therefore, the purpose of the IAD is "to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints." Article I.

■ · When a detainer has been lodged against a prisoner who is serving a term of imprisonment in a party state, the IAD provides two different procedures for disposition of the charges. Under Article III, the prisoner may request disposition of the charges underlying the detainer, in which case the prisoner must be brought to trial within 180 days after the prisoner causes to be delivered to the prosecuting officer and appropriate court written notice of his imprisonment and request for final disposition of the charges. *See* Article III(1). Under Article IV, a state may initiate the process by presenting "a written request for temporary custody" to the appropriate authorities of the state of incarceration. Article IV(1). In that event, the prisoner's trial must commence within 120 days "of the arrival of the prisoner in the receiving state, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance." Article IV(3). If an action on which the detainer is based is not brought to trial within the applicable time periods under Articles III or IV, the appropriate court where the charge is pending "shall enter an order dismissing the same with prejudice, and any detainer based thereon shall cease to be of any force or effect." Article V(3). The time periods under Articles III and IV, however, may be "tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter." Article VI(1).

■ In furtherance of the purpose that the charges underlying a detainer be resolved quickly and in a manner that limits the burdens imposed on prisoners by detainers, the IAD contains what are commonly referred to as anti-shuttle or anti-shuffling provisions which are designed to avoid the shuttling of prisoners to and from party states that have lodged detainers. Once a prisoner is in the custody of the receiving state, if the prisoner is returned to the original place of imprisonment before trial is held on the outstanding charges, the "indictment, information or complaint shall not be of any further force

or effect, and the court shall enter an order dismissing the same with prejudice." Article III(4); Article IV(5).

## II

The trial court determined that the 120–day time requirement under Article IV was not triggered in this case.[2] The court reasoned that the March 8, 1985, writ of habeas corpus ad prosequendum issued to the Marshal Service, "although the equivalent of a 'written request for temporary custody,' was not a detainer," and ruled that "no detainer was filed against Runck while he was held as a prisoner by the federal government at the Cass County jail." We disagree with the trial court's resolution of this issue.

■ A necessary prerequisite to the operation of the IAD is that a detainer has actually been lodged by the charging state with the jurisdiction in which the prisoner is held. *United States v. Mauro*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978). Because the IAD itself does not define a detainer, courts have adopted the definition found in the House and Senate reports accompanying the federal government's adoption of the IAD. *See, e.g., Mauro, supra; U.S. v. Weaver*, 882 F.2d 1128 (7th Cir.), *cert. denied*, 493 U.S. 968, 110 S.Ct. 415, 107 L.Ed.2d 380 (1989). According to those reports, a detainer is simply "a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction." 1970 U.S.Code Cong. & Admin.News 4864, 4865. The United States Supreme Court has further defined a detainer as "a request filed by a criminal justice agency with the institution in which a prisoner is incarcerated, asking the institution either to hold the prisoner for the agency or to notify the agency when release of the prisoner is imminent." *Carchman v. Nash*, 473 U.S. 716, 719, 105 S.Ct. 3401, 3403, 87 L.Ed.2d 516 (1985).

In *Mauro*, the Supreme Court held that a writ of habeas corpus ad prosequendum issued by a federal court to state authorities, directing the production of a state prisoner for trial on federal criminal charges, is not a detainer within the meaning of the IAD and does not trigger its application. The *Mauro* Court further ruled, however, that the United States is bound by the IAD when it activates its provisions by filing a detainer against a state prisoner and then obtaining his custody by means of a writ of habeas corpus ad prosequendum.

In determining that a writ of habeas corpus ad prosequendum is not a detainer for purposes of the IAD, the Court focused on the historical difference between the role of the writ, which merely secured the immediate presence of a defendant at court and did not interrupt the rehabilitative process, and detainers, which frustrated rehabilitative efforts because they remained lodged against prisoners for lengthy periods of time without any action taken on them.

> "Unlike a writ of habeas corpus *ad prosequendum* issued by a federal district court, a detainer may be lodged against a prisoner on the initiative of a prosecutor or law enforcement officer. Rather than requiring the immediate presence of the prisoner, a detainer merely puts the officials of the institution in which the prisoner is incarcerated on notice that the prisoner is wanted in another jurisdiction for trial upon his release from prison. Further action must be taken by the receiving State in order to obtain the prisoner...."

\* \* \* \* \*

> "[I]t is not necessary to construe 'detainer' as including these writs in order to keep the United States from evading its duties under the Agreement. When the United States obtains state prisoners by means of a writ of habeas corpus *ad prosequendum*, the problems that the

---

**2.** The trial court also determined that there was no violation of Article III in this case because Runck had failed to comply with various re-

quirements that trigger the 180–day period. We agree with the trial court that Runck failed to establish any violation of Article III in this case.

Agreement seeks to eliminate do not arise; ..." *Mauro, supra,* [436 U.S. at 358, 361], 98 S.Ct. at 1846, 1847 [footnotes omitted].

In support of its conclusion that a writ of habeas corpus ad prosequendum can be a "written request for temporary custody" within the meaning of Article IV, the Court reasoned:

"Once the Federal Government lodges a detainer against a prisoner with state prison officials, the Agreement by its express terms becomes applicable and the United States must comply with its provisions. And once a detainer has been lodged, the United States has precipitated the very problems with which the Agreement is concerned. Because at that point the policies underlying the Agreement are fully implicated, we see no reason to give an unduly restrictive meaning to the term 'written request for temporary custody.' It matters not whether the Government presents the prison authorities in the sending State with a piece of paper labeled 'request for temporary custody' or with a writ of habeas corpus *ad prosequendum* demanding the prisoner's presence in federal court on a certain day; in either case the United States is able to obtain temporary custody of the prisoner. Because the detainer remains lodged against the prisoner until the underlying charges are finally resolved, the Agreement requires that the disposition be speedy and that it be obtained before the prisoner is returned to the sending State. The fact that the prisoner is brought before the district court by means of a writ of habeas corpus *ad prosequendum* in no way reduces the need for this prompt disposition of the charges underlying the detainer. In this situation it clearly would permit the United States to circumvent its obligations under the Agreement to hold that an *ad prosequendum* writ may

not be considered a written request for temporary custody." *Mauro, supra,* [436 U.S. at 362], 98 S.Ct. at 1848 [footnote omitted].

Although the writ of habeas corpus ad prosequendum was issued by a federal court in *Mauro,* the decision has been followed regardless of whether the writ emanated from a federal or a state court. *See People v. McLemore,* 411 Mich. 691, 311 N.W.2d 720 (1981), and cases collected therein.[3]

■ We believe that the documents served on March 8, 1985, on the Marshal Service, which had custody of Runck, constituted both a detainer and a written request for temporary custody within the meaning of Article IV of the IAD. Even if, under *Mauro,* the writ itself was not a detainer, but only a written request for temporary custody, the documents accompanying the writ sufficiently notified the federal authorities that Runck was wanted to face pending criminal charges in North Dakota. A complaint was in existence at the time, and the affidavit of the prosecutor informed federal authorities that Runck "will be charged with felony criminal offenses" in North Dakota. This is all that is required for the lodging of a detainer. *See, e.g., Finley v. State,* 295 Ark. 357, 748 S.W.2d 643 (1988) [court order providing that sheriff make arrangements for the transfer of prisoner to state custody so proceedings could go forward on state charges pending against him and providing for prisoner's return to federal custody after state proceedings constituted detainer]; *Riley v. State,* 180 Ga.App. 409, 349 S.E.2d 274 (1986) [letter stating there was an outstanding warrant for prisoner and that prosecution was intended constituted detainer]; *State v. Smith,* 316 Md. 223, 557 A.2d 1343 (1989) [felony arrest warrant and accompanying statement of charges constituted detainer and "untried complaint"]; *People v. Office,* 126 Mich.App. 597, 337

3. In North Dakota, a district court has "authority to issue such writs as are necessary to the proper exercise of its jurisdiction." N.D.Const. Art. VI, § 8. The federal government is not bound to honor state court writs of habeas corpus ad prosequendum seeking prisoners in federal custody, but may consent, in its discretion, to do so on principles of comity, as it apparently did in this case. *See, e.g., Ponzi v. Fessenden,* 258 U.S. 254, 42 S.Ct. 309, 66 L.Ed. 607 (1922); *Com. of Puerto Rico v. Perez Casillas,* 624 F.Supp. 822 (D.Ct.Puerto Rico 1985).

N.W.2d 592 (1983) [letter, accompanied by administrative warrant, advising authorities that prisoner was wanted in Michigan constituted detainer].

The State argues, however, that the IAD is nevertheless inapplicable under the circumstances because Runck remained at the Cass County jail and never entered a federal correctional institution until January 1986. We recognize that courts disagree over whether the IAD is triggered when a detainer is lodged against a prisoner while that prisoner, after sentencing, is held in temporary custody in a jail or other facility awaiting transport to a correctional institution. Courts which rule that a detainer lodged against a prisoner in temporary custody is of no effect and does not bring the IAD into play reason that, because the basic purpose of the IAD is to prevent interference with institutional care and rehabilitation, which is not normally available at a facility or jail designed for temporary custody of prisoners, "one cannot interrupt that which has not yet started." *Crooker v. U.S.*, 814 F.2d 75, 77 (1st Cir.1987). *See also United States v. Glasgow*, 790 F.2d 446 (6th Cir.1985), *cert. denied*, 475 U.S. 1124, 106 S.Ct. 1647, 90 L.Ed.2d 191 (1986); *United States v. Wilson*, 719 F.2d 1491, 1495 n. 1 (10th Cir.1983); *Lublin v. Johnson*, 628 F.Supp. 1496 (D.Ct.E.D.N.Y.1986); *Dorsey v. State*, 490 N.E.2d 260 (Ind.1986); *State v. Wade*, 105 Nev. 206, 772 P.2d 1291 (1989); *People v. Reilly*, 136 A.D.2d 355, 527 N.Y.S.2d 234 (1988). Courts which decline to distinguish between temporary and correctional custody in establishing the point at which the protections of the IAD become applicable reason that a rule encompassing all post-sentence confinement would be easier to apply, would avoid the possibility of encouraging the sending state to extend the period of confinement in a temporary facility because of outstanding detainers, and would alleviate judicial examination of an individual prisoner's rehabilitative status while in temporary confinement whenever an IAD claim is raised. *See Escalanti v. Superior Court*, 165 Ariz. 385, 799 P.2d 5 (Ct.App.1990); *Hughes v. District Court In & For City, Etc.*, 197 Colo. 396, 593 P.2d 702 (1979); *Felix v.*

*United States*, 508 A.2d 101 (D.C.Ct.App. 1986); *State v. Lock*, 839 S.W.2d 436 (Tenn. Ct.Crim.App.1992).

■ Resort to one of these "bright line" rules is neither necessary nor desirable. When a prisoner's stay in a temporary facility pending transport to a correctional institution is, in fact, temporary and of short duration, the rule that the filing of a detainer and a request for temporary custody of the prisoner trigger the IAD's protections regardless of the de minimis effect on the prisoner's commencement of rehabilitation at the correctional institution to which the prisoner has been sentenced exalts form over substance. On the other hand, when the prisoner's detainment at a temporary facility is not temporary, but is substantially lengthened by the filing of a detainer and request for temporary custody, applying a rule that the IAD's protections are simply inapplicable not only allows a party state to circumvent its obligations under the Agreement, but also implicates the very evils the IAD was intended to rectify. A detainer's impact upon a prisoner awaiting transfer to another facility is no less destructive of the purposes of rehabilitation if it substantially delays implementation of programs instead of interrupting them. *See Lock, supra.*

■ In this case, after Runck's federal conviction, he was housed at the Cass County jail in federal custody to testify at a pending federal prosecution. The trial court did not address when, or if, Runck testified during those federal proceedings. Although the detainer and writ filed by the State clearly envisioned minimal state custody for only the initial county court proceedings against Runck and a prompt return to federal authorities upon their completion, that did not occur. Rather, from March 8, 1985, until January 1986, Runck remained in State custody at the Cass County jail. Runck presented evidence to make a prima facie showing that his delay in arriving at the federal correctional institution in Oxford prejudiced him and had an adverse impact on his rehabilitation program and his qualifications for "extra good time credits."

Under these circumstances, we believe that, in order for the State to prevail on its argument that the IAD was inapplicable while Runck was housed at the Cass County jail, the State must establish that Runck would have remained at the Cass County jail under the control of federal authorities until January 1986, regardless of the existence of the detainer and Runck's pending state charges. This conclusion comports with the IAD's directive that it be liberally construed so as to effectuate its remedial purpose. Article IX; *Cuyler, supra*. Because this is a case of first impression in this jurisdiction, and because we adopt a hybrid approach for resolving the issue under these circumstances, we remand to the trial court to allow the State an opportunity to make the requisite showing.

■ The State argues that Runck waived any IAD violations prior to December 30, 1985, when he pleaded guilty. However, the cases relied upon by the State, *Beachem v. Attorney General of Missouri*, 808 F.2d 1303 (8th Cir.1987); *United States v. Hobson*, 686 F.2d 628 (8th Cir.1982); and *Camp v. United States*, 587 F.2d 397 (8th Cir.1978), involve convictions based on guilty pleas that were accepted by the trial court, and rest on the well-established principle that a valid guilty plea operates as a waiver of all non-jurisdictional defects or errors. *See, e.g., State v. Slapnicka*, 376 N.W.2d 33 (N.D.1985); *State v. Cook*, 344 N.W.2d 487 (N.D.1984). In this case, acceptance of Runck's guilty plea was conditioned on his testifying truthfully at any trial of persons involved in the April 1983 fire and, as we have noted before, lacked "the certainty a plea agreement is expected to provide." *State v. Runck, supra*, 418 N.W.2d at 264. Ultimately, the plea agreement was rejected by the trial court. In *Runck*, we declined to accept the State's argument that Runck waived his right to complain of a speedy trial violation by entering into this contingent guilty plea,

but held that the delay caused by his conduct regarding the guilty plea, such as his refusal to testify and failure to clarify the status of the plea agreement, could be attributed to him in determining whether a speedy trial violation occurred. We see no principled reason for treating the contingent guilty plea any differently here, where Runck claims violations of the IAD.[4] *Cf. People v. Bell*, 669 P.2d 1381 (Colo. 1983) [although guilty plea entered pursuant to plea bargain waives defendant's right to speedy trial, until plea is accepted, defendant's position is substantially the same as it was prior to entry of plea, and defendant's interest in speedy disposition of charge continues unabated].

The State asserts that "virtually all" of the delays in Runck's prosecution were necessary and reasonable, were the result of actions on his part, and occurred in open court with Runck and counsel present. The trial court made detailed findings concerning the judicial proceedings leading up to Runck's conviction, but, apparently because of its conclusion that the IAD was inapplicable in this case, did not determine whether there was "good cause shown in open court, the prisoner or his counsel being present," for "any necessary or reasonable continuance" as required by Article IV(3) for lengthening the 120–day period. Nor was there a determination that the time period was ever "tolled" under Article VI(1). The trial court also did not address any possible violations of the anti-shuffling provisions of Article IV(5). Resolution of these issues by this court would be both inappropriate and premature. We believe the trial court should make the initial determination of these matters upon remand, in the event that the court finds it necessary to do so after resolution of the IAD's applicability during Runck's confinement in the Cass County jail.

4. The State does not assert that Runck waived any claimed violations of the IAD by failing to specifically raise those issues prior to or during the trial proceedings, so we do not consider the issue. We note, however, that a defendant's failure to invoke the IAD in specific terms in speedy trial motions before the trial court does not alone result in a waiver of the claim that the IAD has been violated. *See United States v. Mauro*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978).

### III

We conclude that both a detainer and a written request for temporary custody of Runck were filed with federal authorities on March 8, 1985. We remand to give the State an opportunity to establish that the IAD was inapplicable during Runck's incarceration at the Cass County jail because Runck would have remained in federal custody at the jail until January 1986 regardless of the detainer and pending state charges, or, if applicable, that the IAD was not violated under the circumstances.

We have considered the other arguments raised by Runck and deem them to be without merit.

We reverse and remand for further proceedings consistent with this opinion.

MESCHKE and LEVINE, JJ., and RALPH J. ERICKSTAD, Surrogate Judge, concur.

Surrogate Judge RALPH J. ERICKSTAD was Chief Justice at the time this case was heard and served as surrogate judge for this case pursuant to Section 27–17–03, N.D.C.C.

J. PHILIP JOHNSON, J., who was a member of the Court when this case was heard, did not participate in this decision.

NEUMANN and SANDSTROM, JJ., not being members of the Court when this case was heard, did not participate in this decision.